OMAHA GENERAL HOSPITAL, APPELLANT, V. ROBERT C. STREHLOW, APPELLEE.

FILED MAY 29, 1914. No. 17,688.

1. **Principal and Agent:** ACTS OF AGENTS: LIABILITY OF PRINCIPAL. Where a master, at the time his employee receives a severe bodily injury, calls his own regular physician and surgeon over the telephone and instructs him "to come and take care of the injured man," and at the time of giving such direction well knows that the injuries of his employee are of such a character as to render it necessary to immediately remove him to a hospital, and the doctor at once responds and takes the man to a hospital, and for the purpose of inducing the hospital authorities to receive him states to them that the principal for whom he is acting will be responsible for the payment of the hospital bill of the injured man, the master is bound by such acts and declarations on the part of his agent.

2. **Contracts:** TERMINATION. And where subsequently, and while the patient was yet incapable of being removed or discharged from the hospital without great danger to his life or health, the master gave notice that thereafter he would not be responsible for care and treatment ''from now on,'' *held*, that the master had no right to thus terminate his liability; that, under the circumstances, it was an implied condition of the contract that the master could only terminate his liability to the hospital by removing the patient, or when he could be dismissed by the hospital without serious danger to his life or health, or by showing that the injured man had means out of which the hospital could and should have collected its pay.

APPEAL from the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. *Reversed.*

*William Baird & Sons,* for appellant.

*Greene, Breckenridge, Gurley & Woodrough, contra.*

FAWCETT, J.

Plaintiff is a corporation for the purpose of carrying on a general hospital business for pay. Defendant was a building contractor. In March, 1910, John T. Anderson, one of defendant's employees, while engaged in work for defendant, fell from a trestle and was seriously injured. Upon receiving such injury he was taken by defendant's regular physician to plaintiff's hospital, where he remained and received surgical and hospital treatment until October following, when he died. This action was instituted in the district court for Douglas county against defendant to recover for such services. There was a trial to the court without the intervention of a jury. Judgment was entered for plaintiff in the sum of $15, from which it appeals.

The petition alleges the above facts in customary language; alleges that Anderson was in the hospital for 29 weeks; that plaintiff received him into its hospital at the instance and request of defendant, and relying solely upon the credit of defendant, and prays judgment for the sum of $320. The answer admits that defendant was engaged in the contract business; that Anderson was in his employ and received an injury at the time stated in the petition, and that Anderson "went to said Omaha Gen-

eral Hospital for care and treatment;" but denies that he was sent to the hospital or kept there at the request of defendant; alleges that on several occasions he informed the general manager of plaintiff that he (defendant) would not pay or guarantee the payment of the hospital charges for Anderson.

The errors assigned are that the court erred in not entering judgment for plaintiff for the full amount of its claim, for the reason that the evidence shows that defendant's doctor had authority to place Anderson in the hospital and to bind defendant for the payment of the hospital bill; that the evidence shows that defendant had knowledge of and acquiesced in the placing of Anderson in the hospital "and ratified all his agent's (Doctor Ward's) acts in connection therewith, and is estopped from denying his liability on this hospital bill."

The finding and judgment of the trial court were based upon the theory that defendant was only liable to plaintiff for emergency treatment, and the sole question involved is the correctness of that holding upon the evidence in the record before us. Doctor Ward, who acted for defendant at the time, departed this life prior to the trial of the court below. Anderson was also dead. The evidence as to what transpired after the accident and at the time of taking Anderson to the hospital is given by defendant himself and by the general manager of the hospital. Defendant testified that Anderson was in his employ; that in trying to climb a trestle he fell and broke his leg; that he was not present, but was in his home nearby; that he was called from his home to the scene of the accident. "Q. What did you do after you were called over there? A. I called at once to my doctor and told him to come at once, a man was hurt there. Q. Who was your doctor? A. Dr. Ward. * * * Q. What did you state to Dr. Ward? A. I just simply told him through the phone to come and take care of the injured man. Q. He came, did he? A. Yes; he came at once. Q. Dr. Ward was your regular physician? A. Yes, sir. Q. Was this man Anderson able to get about at that time? A. No;

while I called for the doctor somebody called for the am-
bulance, and they took care of him in the ambulance."
This is all the evidence in relation to what was said by
defendant to Doctor Ward.

Mr. Robel, the manager of plaintiff, testified that Ander-
son was brought to the hospital on March 25, 1910, and
remained there until October 14. "Q. Who brought him
to the hospital? A. Dr. Ward. Q. Dr. Ward to which
Mr. Strehlow has testified? A. Yes; now deceased. Q.
Will you state the fact as to whether you had any con-
versation with Dr. Ward as to who was to pay for this
man's injury in the hospital? A. I did have such con-
versation. Q. Will you kindly state to the court—state
the conversation, or the substance thereof, as you may re-
member it? A. Dr. Ward informed me that Mr. Streh-
low would be responsible for the payment of the hospital
bill of Mr. Anderson; that he was employed by Mr. Streh-
low to look after his men, and had been ordered by him
to take Mr. Anderson to the hospital. Q. Then, if I under-
stand you correctly, Dr. Ward informed you that Mr.
Strehlow would pay you for the services that the hospital
rendered? A. Yes, sir." This is all of the evidence as to
what was said by Doctor Ward at the time he placed An-
derson in plaintiff's hospital. Mr. Robel was then inter-
rogated as to a conversation he had with defendant about
five days after Anderson was taken to the hospital, as fol-
lows: "Q. Will you state that conversation as you re-
member it, or the substance of it? A. Mr. Strehlow stated
to me that he wished to state that he wouldn't be respon-
sible for the payment of the John F. Anderson account
'from now on.' My reply was that we had been holding
him responsible for the payment of it and would continue
to do so. To which he replied, 'You fight it out with the
insurance company.' My reply to that was that we had no
fight with the insurance company; the hospital didn't pay
the premium for the protection of his men; if there was
any fight in connection with the case, of course it must
be with him. Q. That was all, was it, of the conver-
sation? A. That was all."

The evidence clearly establishes the fact that from the time Anderson was taken to the hospital until the moment of his death there never was a time when he could have been safely removed therefrom.  The injury proved to be a very serious one.  A number of necessary operations were performed; but, in spite of all the well-known skill of Doctor Ward, Anderson died.  There is no evidence that defendant at any time, subsequent to his interview with Mr. Robel, offered to remove Anderson from the hospital, nor was any evidence offered by defendant to show that Anderson was possessed of any property or funds from which plaintiff could have recovered pay for its services. It is contended by defendant that Doctor Ward had no authority to bind defendant for the payment of Anderson's hospital charges.  We think this contention is unsound.  According to defendant's own testimony, he placed no limitation upon his instructions to Doctor Ward, who was his regular doctor.  He called him "and told him to come at once, a man was hurt."  When asked what he stated to Doctor Ward, he testified: "I just simply told him through the phone to come and take care of the injured man."  He showed that, while he was telephoning, somebody—evidently some of his other employees—called for the ambulance.  He knew, therefore, that the man was badly injured, and that an ambulance was necessary to convey him somewhere for treatment.  While no witness so testified, it is a fair inference that Anderson was a single man.  He could not in his then condition be taken to his room, and hence defendant could not help but know that he would have to be taken to a hospital.  He did not direct Doctor Ward to simply administer first aid or to give him emergency treatment, but he told him "to come and take care of the injured man."  He did the proper and humane thing, just what any employer ought to do where an employee is lying helpless as the result of an injury received in his employment.  He knew, as well as he knew anything, that Doctor Ward would at once take Anderson to a hospital, and, if he wanted to place any limitation upon the doctor's authority to bind him for

services rendered by the hospital, then was the time for him to impose such limitation. It is clear, therefore, that Doctor Ward was fully authorized by defendant to take Anderson to a hospital.

After he was taken to plaintiff's hospital, defendant said nothing to the hospital authorities for five days, and not then until, as he himself testifies, he was called by the manager, when for the first time he told them that he would not be responsible for the payment of the Anderson account "from now on." By this statement he recognized the right of Doctor Ward to take Anderson to the hospital, and ratified that act. The only question, therefore, for our determination is: Could he, after having unloaded his helpless employee upon the plaintiff, relieve himself from further liability by his own *ipse dixit,* or was it his duty, after taking Anderson to the hospital, to pay for the hospital charges up to that time and remove him to some other place? If he did not want to be further liable and Anderson had no means to pay the charges himself, was it the defendant's duty to appeal to the proper "poor authorities," or did that duty rest upon the plaintiff?

Defendant cites *Salter v. Nebraska Telephone Co.,* 79 Neb. 373. The holding in the third paragraph of the syllabus in that case seems to sustain his contention and to hold that, when defendant declined to be further responsible, his liability would only exist for a time sufficient to enable the plaintiff to give notice to the proper poor authorities if Anderson was entitled to public care. There is a difference, however, between that case and this. In that case the injured employee was taken to the hospital by the foreman in charge of the working gang, who made arrangements with the hospital for the reception and treatment of the employee, all of which was done, as we gather from the opinion, under the emergency which then confronted the foreman, and without the knowledge of the managing officers of the telephone company. On the very next day the hospital authorities were notified that the defendant would not be responsible for any services other than the first treatment. In this case we think Anderson

was taken to the hospital by direction of the defendant
as fully as if defendant had given that direction to Doctor
Ward in express terms. In other words, we think that,
when Doctor Ward took Anderson to the hospital and
stated that defendant would be responsible for his treat-
ment, it was the same as if defendant had taken him there
himself and made that statement. He has no more right
to disaffirm what was done and said by Doctor Ward than
if he had done and said the same things himself. We are
therefore unwilling to apply the rule announced in *Salter
v. Nebraska Telephone Co., supra,* but prefer to adopt the
reasoning and holding in *St. Barnabas Hospital v. Min-
neapolis International Electric Co.,* 68 Minn. 254. That
was an action to recover for the care and treatment of one
Soutar, given and performed at the instance and request
of defendant. Soutar sustained severe injuries while in
defendant's employment. The defendant took him to the
hospital, and plaintiff received and accepted him as a pa-
tient upon the faith of defendant's promise to pay for his
care and treatment. The evidence on the part of plaintiff
was that nothing was said about the length of time, while
defendant's evidence was to the effect that his promise was
to pay for his care until further notice. The court say:
"As we view the case, it is immaterial which is correct."
Soutar was taken to the hospital on October 22. On No-
vember 12 defendant gave notice that he would not con-
tinue responsible for any further treatment or care of
Soutar after the next day. The court say: "The conten-
tion of the defendant was that it had the absolute right
to terminate its promise instanter at any time by giving
notice to that effect, and therefore could not, under any
circumstances, be held liable for Soutar's care and treat-
ment after November 13. The contention of the plaintiff,
and the view of the law on which the court submitted the
case to the jury, was that under the circumstances the
agreement was not one which the defendant had an abso-
lute right to terminate at any time merely by giving no-
tice; that defendant, having brought a seriously injured
man to the hospital, and the plaintiff having taken him in

and accepted him as a patient at the request of defendant, and on the faith of its promise to pay, it would remain liable, notwithstanding notice to the contrary, until it removed him, or until he sufficiently recovered, so that he could have been dismissed or put out of the hospital without great danger to his health or life, unless it appeared that he had means of his own out of which plaintiff could have collected its pay. This was an implied condition, upon which the contract could be terminated. It is in accord alike with common sense and the dictates of humanity. The plaintiff having taken in a helpless and severely injured man at the defendant's request, and upon its promise to pay for an indefinite time, it would be monstrous if the defendant could, the very next day, summarily withdraw its promise, leave the sick man on plaintiff's hands, and put it to the alternative of either keeping and caring for him without pay, or else cruelly and inhumanly throwing him into the street." With regard to the probable ability of Soutar to pay, the court say: "There was no evidence that Soutar had any means to pay for his own treatment. All that it shows is that he was a single man, and presumably had no home of his own. The charge of the court implies that the burden was on the defendant, if it would relieve itself from liability on that ground, to show that Soutar had means to pay for what care he received. We are of opinion that this was right. Plaintiff's contract was with the defendant, and not with Soutar. Defendant having brought the patient to the hospital, and promised to pay for his treatment, if it would relieve itself of liability after notice, notwithstanding its failure to remove him, and the further fact that he was in no condition to be dismissed, it was at least incumbent on it to show that plaintiff could and should have collected its pay from Soutar himself." We adopt the reasoning of the Minnesota court. Applying the law as there announced, defendant has not shown any facts which relieve him from his liability for the full amount of plaintiff's claim.

The judgment of the district court is therefore reversed and the cause remanded for further proceedings.

REVERSED.

BARNES, ROSE and SEDGWICK, JJ., not sitting.